# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| **ROBERT E. NOORDAM and** | ) | **Case No. 04-20823-TLM** |
| **MERRY D. NOORDAM,** | ) | |
| | ) | |
| Debtors. | ) | **MEMORANDUM OF DECISION** |
| | ) | |
| _____ | ) | |
| | ) | |
| **CHARLES COX,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Adversary No. 04-6196-TLM** |
| | ) | |
| **ROBERT E. NOORDAM and** | ) | |
| **MERRY D. NOORDAM,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## INTRODUCTION

The facts in this litigation are complicated.  The situation now presented

took an extended period of time to develop and, following trial, it has

unfortunately taken an extended period to evaluate and resolve.

MEMORANDUM OF DECISION - 1

The factual complexity results from the actions debtors Robert and Merry Noordam ("Defendants") have taken over a period of many years in connection with multiple businesses they owned and ran.  Many of the actions relevant to the present legal dispute occurred quite some time ago; others took place in the period just prior to, or directly after, their present chapter 7 bankruptcy petition was filed in June 2004.

This adversary proceeding was brought by one of their creditors, Charles Cox ("Plaintiff"), who has long sought to collect a debt from Defendants, who have in turn long attempted to avoid or prevent such collection.

Plaintiff objects to the entry of Defendants' chapter 7 discharge under several provisions of § 727(a).[1]  This matter was tried to the Court and taken under advisement.  Having had the opportunity to fully consider and weigh the evidence, and evaluate the legal contentions of the parties including those addressed in their post-trial briefing, the Court enters this Decision.  It constitutes the Court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052.[2]

---

[1]  Unless otherwise indicated, all statutory citations are to the Bankruptcy Code, Title 11, U.S. Code.

[2]  It is undisputed that the Court has jurisdiction over this adversary proceeding, 28 U.S.C. § 1334(b), that the same is a core proceeding, 28 U.S.C. §§ 157(b)(1), (b)(2)(J), and that venue is proper, 28 U.S.C. § 1409.

MEMORANDUM OF DECISION - 2

## BACKGROUND AND FACTS[3]

This is not the first time the Court has considered disputes between these

litigants.  It previously determined that Defendants' earlier chapter 13 case, which

had been converted from chapter 7 on the eve of trial on a § 523(a) and § 727(a)

action brought by Plaintiff, would be dismissed for cause and with prejudice to

Defendants' filing another bankruptcy case for a period of one year.  *See In re*

*Noordam*, 03.2 I.B.C.R. 136 (Bankr. D. Idaho 2003) (hereafter "*Noordam I*").[4]

Since context matters, a short review of the evidence and the Court's findings in

*Noordam I* follows.

### A.  *Noordam I*

The parties' relationship arose in 1995.  Plaintiff lent money to Defendants

in relation to a transaction involving certain real property in Spirit Lake, Idaho.

*See Noordam I*, 03.2 I.B.C.R. at 137.  After foreclosing a security interest in that

property, Plaintiff pursued litigation to recover a deficiency claim.  *Id.*

In 1999, while Plaintiff's state court suit was pending, Defendants formed

two entities, MAR Enterprises, Inc. ("MAR") and M&M Realty Services, Inc.

---

[3] All factual findings based on testimony reflect and incorporate the Court's evaluation of the credibility and veracity of the witnesses, the Court having carefully listened to and observed them during the trial, and also reflects the weight ascribed to their testimony.  This is true even where the Court does not make specific reference to credibility in addressing the facts.

[4] The Court's prior Memorandum of Decision and Order were introduced as Ex. 1. Citation is made, for ease of reference, to the reported decision.

MEMORANDUM OF DECISION - 3

("M&M").  *Id.*[5]  Defendants transferred substantial personal and real property assets from their own names to MAR, and a number of escrowed real estate contracts to M&M.  *Id.*

Defendants filed a chapter 13 proceeding in 2000, Case No. 00-20582.  In May, 2000, shortly after their chapter 13 case was filed, Defendants sent letters to their creditors, indicating the asset transfers to their newly created corporations, MAR and M&M, were "to protect the assets and the investors that work with us[.]"  *Noordam I* at 138.  The letter continued by indicating the incorporation of the businesses, the asset transfers and the bankruptcy filing were designed to halt Plaintiff's litigation and prevent his ability to access Defendants' assets.  *Id.*

The 2000 case was voluntarily dismissed by Defendants under § 1307(b) on August 23, 2000.  *Id.* at 136 n.1.  A little over a year later, on November 14, 2001, they filed a chapter 7 petition commencing Case No. 01-21593.  *Id.* at 136.  Plaintiff brought an adversary proceeding, Adv. No. 02-6036, seeking a judgment that his claim was excepted from discharge under § 523(a) and that Defendants' discharge should be denied under § 727(a).  On the date trial was to commence, Defendants moved to convert their case to chapter 13.  That motion was granted,

---

[5]  M&M's predecessor was "M&M Realty & Escrow Service," a sole proprietorship of Defendants until M&M was formed in September, 1999.  *See, e.g.*, Ex. 3 at statement of financial affairs (hereafter on occasion "SOFA"), response to question 18(a).

MEMORANDUM OF DECISION - 4

though Plaintiff was allowed an administrative expense in light of the untimely

nature of the motion. *Id.*

Plaintiff subsequently asked that the chapter 13 case be dismissed under

§ 1307(c) for cause including Defendants' alleged bad faith. Following analysis

of the facts established at hearing and the relevant legal standards, the Court

concluded that the bankruptcy filing was indeed made in bad faith, granted the

motion, and dismissed the case "with prejudice" to any subsequent bankruptcy

filing within one year of the dismissal. *Id.* at 139-40 (following *Leavitt v. Soto (In*

*re Leavitt)*, 171 F.3d 1219 (9th Cir. 1999), and *Ho v. Dowell (In re Ho)*, 274 B.R.

867 (9th Cir. BAP 2002)).[6]  A brief excerpt from *Noordam I* explains:

> [T]he material facts include, but are not limited to: (1) Debtors'
> multiple transfers of significant real and personal property to closely-
> held, insider entities, without competent proof of adequate
> contemporaneous consideration; (2) the lack of required disclosure of
> these transfers in sworn bankruptcy submissions; (3) the other errors
> and omissions in Debtors' sworn schedules in the 2000 and 2001
> bankruptcy filings, rendering their characterization of their financial
> situation not only incomplete but misleading; (4) Debtors' admissions
> in their letters to creditors that the transfers of assets and the 2000
> bankruptcy filing were designed to deny Cox the ability to pursue his
> claims; (5) the material differences between the factual statement
> submitted to Washington Trust Bank and the 2000 bankruptcy

---

[6] *Ho* established that, in considering a request to dismiss for cause under § 1307(c)
which alleged bad faith, the court must review the totality of the circumstances and should
consider (1) whether the debtor misrepresented facts in his petition or plan, unfairly manipulated
the Code, or otherwise filed the petition or plan in an inequitable manner; (2) the debtor's history
of bankruptcy filings and dismissals; (3) whether the debtor's only purpose in filing was to defeat
state court litigation; and (4) whether egregious behavior is present. *Noordam I*, 03.2 I.B.C.R. at
139 (citing *Ho*, 274 B.R. at 876) (other citations omitted)).

MEMORANDUM OF DECISION - 5

schedules and statements; and (6) the eleventh-hour conversion of the
2001 chapter 7 case to a chapter 13, when Cox's suit raising these
several issues was called for trial.

The Court thus finds misrepresentation of fact in Debtors'
bankruptcy submissions, an unfair manipulation of the Code, and a use
of the bankruptcy filing in an inequitable manner.  The purpose of the
initial chapter 13 filing was to defeat state court litigation.  This "legal
maneuver" was here accompanied by a wholesale, orchestrated
movement of assets designed to place them beyond Cox's reach.
Debtors then failed to disclose such transfers as they were required to
do in their bankruptcy.  Egregious behavior is present.  When all the
evidence is collectively evaluated, the "totality of the circumstances"
establishes Debtors' bad faith.

*Id.* at 139.

## B.  The June 2004 filing

The resulting dismissal under *Noordam I* occurred on May 9, 2003.  *Id.* at

140.  The prejudicial bar on the filing of another bankruptcy case expired on May

9, 2004.  Within a month of that bar's expiration, Defendants filed a chapter 7

petition for relief on June 2, 2004, commencing the present bankruptcy, Case No.

04-20823-TLM.

Plaintiff had not by then fully recovered on his claim.  He had obtained a

judgment against Defendants in the amount of $169,064.06, entered on February

20, 2004 by the District Court of the First Judicial District, Kootenai County, Case

No. CV 99-00235, following a court trial.  *See* Ex. 2.  Costs and fees of

$18,124.64 were also awarded to Plaintiff by that court on May 11, 2004.  *Id.*

MEMORANDUM OF DECISION - 6

However, he had not moved very far toward collecting the judgment when the bankruptcy petition was filed.[7]

### 1.  Defendants' bankruptcy disclosures

Defendants' petition and schedules in this most recent case disclose their ownership of a residence in Rathdrum, Idaho worth $110,000.00 and ownership of what they call "Debtors' Office" at 265 Sunburst, Coeur d'Alene, Idaho, worth $190,000.00 (hereafter the "Sunburst Property").  *See* Ex. 3 at schedule A.  They scheduled three creditors with secured claims against the residence aggregating $72,600.00[8] and scheduled two consensual secured creditors aggregating $170,000.00 plus real property taxes of $9,000.00 on the Sunburst Property.  *Id.* at schedule D.[9]

Plaintiff's judgment is shown as an unsecured claim of $170,000.00, comprising the vast majority of the $196,699.00 of unsecured debt listed.  *See* Ex. 3 at schedule F.

---

[7] Defendants stated in their filing that Plaintiff garnished Defendants' stock in M&M and MAR on May 7, 2004, less than a month before the June 2 petition filing.  *See* Ex. 3 at SOFA, response to question 4(b).  It appears nothing was collected on the judgment before the present bankruptcy.

[8] The secured creditors shown are American General Finance with a $41,500.00 claim, Don Jackson with a $30,000.00 claim, and Kootenai County with a $1,100.00 claim.

[9] These schedules thus indicate the existence of $11,000.00 in equity in the Sunburst Property and $37,400.00 in equity in the residence.  No homestead exemption was claimed on the residence.  *See* Ex. 3 at schedule C.  However, an amended schedule D indicates that American General's claim is $157,000.00 secured by both the residence and by assets of MAR.  *See* Ex. 7 at schedule D.

MEMORANDUM OF DECISION - 7

According to schedule I, Mr. Noordam is a self-employed "contractor" making $500.00 per month, and Mrs. Noordam is a self-employed "auctioneer/real estate broker" making $1,500.00 per month. *Id.* at schedule I. They claim their $2,000.00 of monthly income is consumed by $1,996.00 of monthly personal expenses. *Id.* at schedule J.[10]

The budget thus claims an aggregate gross income for Defendants of $24,000.00 per year. Their statement of financial affairs, however, asserts "0" gross income for Mr. Noordam in 2002, 2003 and 2004. Ex. 3 at SOFA, response to question 1.[11] It shows Mrs. Noordam's income in 2004 (YTD) as $4,500.00 from M&M. *Id.* It states that her income in 2003 was $18,000.00 from M&M and MAR; and that her 2002 income was also $18,000.00 from M&M and MAR. *Id.*

Contrary to the statement's assertion of aggregate gross income of $18,000.00 for 2003, the last full year before the bankruptcy was filed, Defendants' 2003 personal tax return showed income in the nature of interest and ordinary dividends from MAR of $74,410.00 and interest and ordinary dividends from M&M of $2,698.00. Ex. 32 at schedule B. This $77,108.00 of taxable interest/dividend income is shown in Defendants' calculation of total income. Ex.

---

[10] No business expenses for either self-employed Defendant are shown on this schedule.

[11] By its terms, question 1 requires disclosure of the "*gross* amount of income" for the portion of the current calendar year immediately prior to the date of filing, and for the two preceding years.

MEMORANDUM OF DECISION - 8

32 at 1, line 7.  Defendants also claimed losses of $39,469.00.  *Id.* at line 17.[12]

They further asserted a net operating loss carryforward in excess of $326,000.00.

*Id.* at line 21.[13]

Defendants' interests in M&M, MAR and other businesses were disclosed

in the bankruptcy in the following fashion.  Defendants claimed to own 100% of

the stock in MAR, and they alleged it was worth $25,055.00.  (A balance sheet

dated May 25, 2004, prepared by Mrs. Noordam for MAR was attached to

schedule B in support of this assertion.  *See* Ex. 3.)  Defendants further asserted

that they owned 49% of the stock of M&M, and claimed the value of that holding

was worth nothing at all.  They also disclosed a 50% ownership interest in

"Miracles, LLC, dba Happy Days Daycare" (hereafter on occasion "Miracles")

and claimed it, too, was worth nothing.  *Id.* at schedule B (item 12).

Debtors also disclosed several checking accounts: two personal accounts

($804.00 collective balance); payroll and advertising accounts for M&M ($250.00

---

[12]  The supporting schedule showed a net loss on rental real estate (the Sunburst Property) of $14,469.00 (after credit of $9,000.00 received in rent), and S corporation passive losses from MAR ($16,442.00) and M&M ($8,558.00).  Ex. 32 at schedule E.

[13]  That there may be *net* losses does not excuse a debtor from the obligation to disclose *gross* income in the statement of financial affairs.  "It is significant that Question Number 1 calls for gross income and not net profit.  To state the conclusion that there was no profit, without providing information as to the amount of gross income, is a complete evasion of the question. Gross income is an important piece of information because it quickly gives the reader an idea as to the size of the debtor's business. . . .  Indeed, most businesses which file bankruptcy have not shown a profit in the most recent years.  To get an idea as to the magnitude of the debtor's business, one first looks at the gross income figure."  *Colonial Bank v. Wynn (In re Wynn)*, 261 B.R. 286, 290 (Bankr. M.D. Ala. 2001).

MEMORANDUM OF DECISION - 9

balance); a "closing transaction account" for M&M with a balance that "varies;" an escrow trust account for M&M that was "inactive" with a minimal balance; and a checking account for Happy Days Daycare with a $500.00 balance. They also disclosed an account for "Showcase Auctions" that they specifically indicated they were "signatory on but not owner of." *Id.* at schedule B (item 2).[14]

### C.  Plaintiff's discovery and suit

Predicably, Plaintiff became an active creditor in the present bankruptcy case. His counsel appeared at the § 341(a) meeting in July 2004 and examined Defendants. He also conducted Rule 2004 examinations of Defendants in early August 2004.

After these examinations, Defendants filed amendments to schedules B, D and F and their statement of financial affairs on August 31. *See* Ex. 7. Defendants stated this amendment "clarifies bank accounts, adds Washington real estate license, adds [a] 1966 trailer and 66x14 mobile [home], adds [an] unsecured creditor . . . and clarifies payments on the Statement of Affairs." *Id.* at 1.

---

[14]  While Defendants' schedules otherwise indicated M&M and MAR were separate corporations, Defendants made no caveat regarding account ownership of any of the M&M or MAR accounts as they did in regard to the Showcase Auctions account. And in regard to each of these accounts – *including* the Showcase Auctions account – Defendants' schedule B indicated the nature of their interest was "C" [for "community"]. *Id.*

MEMORANDUM OF DECISION - 10

On September 7, 2004, Plaintiff timely filed the instant adversary proceeding to contest Defendants' discharge. *See* § 727(c); Fed. R. Bankr. P. 4004(a). In his complaint, Plaintiff raised the following issues or causes:

– Defendants with intent to hinder, delay and defraud Plaintiff transferred, removed and concealed property of the Defendants within one year of the filing of the petition, and concealed property of the estate with such intent after the filing of the petition, thus violating § 727(a)(2)(A) and (B);

– Defendants concealed and failed to keep or preserve records from which their financial condition or business transactions could be ascertained, in violation of § 727(a)(3);

– Defendants knowingly and fraudulently made false oaths or accounts at the meeting of creditors under § 341(a), during their Rule 2004 examinations, and in their bankruptcy petition, schedules and statements, thus violating § 727(a)(4)(A);

– Defendants failed to satisfactorily explain a loss or deficiency of assets to meet their liabilities, and violated § 727(a)(5); and

– Defendants committed acts specified in §§ 727(a)(2), (3), (4) and (5) within the year prior to filing in connection with a bankruptcy case of

MEMORANDUM OF DECISION - 11

an insider, Michael Cord, Case No. 04-20844-TLM, and therefore violated

§ 727(a)(7).

*See* Doc. No. 1 at 5-6.[15]  Finally, Plaintiff alleged that the conduct of Defendants

was such that the Court should consider a surcharge of their exempt property for

the benefit of creditors.  *Id.*

Following commencement of the adversary proceeding, Defendants made

further amendments to their statement of financial affairs and their schedule H (to

reflect a co-debtor).  *See* Ex. 8.  This amendment disclosed a transfer of the Happy

Days Daycare business to Misty Krous.  *Id.* at amended SOFA, response to

question 10.[16]

## DISCUSSION AND DISPOSITION, INCLUDING CONCLUSIONS OF LAW AND ADDITIONAL FINDINGS OF FACT[17]

### A.  Denial of discharge generally

---

[15]  Plaintiff made numerous factual allegations in support of the various causes of action. In his post-trial submissions, Plaintiff "withdrew" or "abandoned" allegations in ¶¶ 3, 6(a), 6(d), 6(f), 6(j), 6(l), 6(m), and 6(p) of his complaint.  *See* Doc. No. 19 at 2.  Plaintiff also abandoned his request for dismissal of the bankruptcy case under § 707.  *Id.* at 1.  The matters so withdrawn will not be discussed further in this Decision.

[16]  Recall, Defendants' original schedules indicated they owned 50% of Miracles, LLC, dba Happy Days Daycare, and they alleged that interest was valueless.  *See* Ex. 3 at schedule B (item 12).  The schedules were signed June 1, 2004.  An "Agreement of Sale/Purchase" between Miracles, LLC and Krous was executed ten days after the bankruptcy filing, on June 11, 2004. *See* Ex. 14.  This matter is discussed further below.

[17]  Though decisions commonly set forth most factual findings prior to consideration of legal contentions and entry of conclusions of law, the Court has determined that in the present case, clarity would be enhanced by considering and setting forth certain relevant factual findings in the context of each of the several causes of action.  This is consistent with the manner in which the parties structured their post-trial briefs.  *See* Doc. Nos. 19, 20.

MEMORANDUM OF DECISION - 12

Section 727 "is the heart of the fresh start provisions" of the Code.  *Lawson v. Hughes (In re Lawson)*, 193 B.R. 520, 523 (9th Cir. BAP 1996) (citations omitted).  Thus, the statutory requirements for a discharge are "construed liberally in favor of the debtor" and "[t]he reasons for denying a discharge must be real and substantial[.]"  *Commerce Bank & Trust Co. v. Burgess (In re Burgess)*, 955 F.2d 134, 137 (1st Cir. 1992); *see also Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996) (construing § 727 "liberally in favor of debtors and strictly against parties objecting to discharge").

While the objecting plaintiff must make a "persuasive" showing, the standard of proof remains that of a preponderance of the evidence.  *Searles v. Riley (In re Searles)*, 317 B.R. 368, 376 (9th Cir. BAP 2004) (applying *Grogan v. Garner*, 498 U.S. 279, 289 (1991), to § 727(a) actions); *Beauchamp v. Hoose (In re Beauchamp)*, 236 B.R. 727, 730 (9th Cir. BAP 1999).  And while the reasons for barring discharge must be substantial and proven, the purpose of § 727 "'is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs.'"  *Oldemeyer v. Couch-Russell (In re Couch-Russell)*, 03.4 I.B.C.R. 230, 233 n. 10 (quoting *Beauchamp*, 236 B.R. at 732).  After all, the fresh start the discharge provides is limited to only the "honest but unfortunate debtor."  *Grogan*, 498 U.S. at 286-87.  As noted by the Ninth Circuit, "Denial of discharge is a harsh result.  However,

MEMORANDUM OF DECISION - 13

bankruptcy has its roots in equity.  To get equity, one must do equity." *Bernard*, 96 F.3d at 1283.

These principles inform the entirety of the Court's analysis of Plaintiff's § 727(a) contentions.

### B.  Cause of action under § 727(a)(2)(A)

#### 1.  Standards

Section 727(a)(2)(A) provides that a debtor may receive a discharge "unless . . . the debtor, with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition[.]"

To obtain denial of discharge under this provision, Plaintiff must prove by a preponderance of the evidence (1) a disposition of property by transfer, destruction, concealment, etc., and (2) a subjective intent on Defendants' part to hinder, delay or defraud Plaintiff or another creditor, or the trustee, through the act of disposition.  Both elements must occur within one year of the petition date. *Couch-Russell,* 03.4 I.B.C.R. at 233 (citing *Fogal Legware of Switzerland, Inc. v. Wills (In re Wills)*, 243 B.R. 58, 65 (9th Cir. BAP 1999)).  The fraudulent intent may be inferred from the actions of a debtor, and established by circumstantial evidence or inferences from a course of conduct.  *Id.*  Thus, while actual, not

MEMORANDUM OF DECISION - 14

constructive, intent is required, it may be proven circumstantially and through accepted "badges of fraud." *Id.*

### 2.  Facts and application of standards

Plaintiff focuses his § 727(a)(2)(A) contentions on Defendants' involvement with two businesses: Showcase Auctions and Miracles.  In short, he argues that Defendants owned these businesses and did not adequately disclose (and, in fact, concealed) the true nature of their ownership interests.  Doc. No. 19 at 2-5.

### a.  Showcase Auctions

The bankruptcy filing indicated that Defendants were signatories on, but not owners of, a "Showcase Auctions" checking account.  Ex. 3 at schedule B (item 2).  The filing also noted that Mrs. Noordam was an "auctioneer."  *Id.* at schedule I.   Nothing else in the filing shed real light on the "Showcase Auctions" business.  Defendants' involvement with that business, if any, was not discussed.[18] No auctioneer's license was disclosed.  The statement of financial affairs did not disclose any income for Mrs. Noordam as an auctioneer or otherwise from Showcase Auctions.[19]

---

[18]  Defendants did disclose that they had possession at their residence of a 1996 Dodge pickup owned by "Showcase Partnership, Inc."  *See* Ex. 3 at SOFA, response to question 14.

[19]  All Mrs. Noordam's income from 2002 through 2004 was claimed to have come from M&M or MAR.  Ex. 3 at SOFA, response to question 1.

MEMORANDUM OF DECISION - 15

### i.  Showcase Partners, Inc.

Showcase Partners, Inc. ("SPI") was organized of record with the Idaho
Secretary of State on December 19, 2002.  *See* Ex. 16.  Mrs. Noordam was the
incorporator, initial registered agent, and director.  *Id.*  The business was located at
12551 North Government Way in Hayden Lake, Idaho.  Exs. 16, 17, 18.  With one
exception, this property appears to have been the site of all Defendants'
businesses, including M&M and MAR.[20]

Mrs. Noordam testified she "assisted" in the incorporation of SPI for
another individual, Joseph O'Masters.  She indicated that O'Masters, even though
he had no license or training as an auctioneer, started "Showcase Auctions" in
2002.  She indicated that O'Masters "put money into" this business, and that she
simply assisted him in running it.  This included her efforts in creating and
keeping corporate documents.

Those documents, Ex. 17, include stock certificates to O'Masters and his
wife, Pamela, executed by O'Masters as corporate president and Mrs. Noordam as
secretary.  Other of these corporate documents indicate Mrs. Noordam acted as
secretary/treasurer and as a director.  O'Masters was shown as the president and
another individual, Michael Cord, was the vice president.  Corporate minutes

---

[20]  The exception is Miracles, which operated the day care business in Defendants'
Sunburst Property.

MEMORANDUM OF DECISION - 16

indicate Mrs. Noordam and Cord were to be the "house auctioneers" for Showcase.[21]

Mrs. Noordam testified she had no ownership interest in the business.[22] She contends she simply acted as a resource to O'Masters, providing his business with access to an auctioneer's license and to her experience in keeping the corporate documentation.[23]

O'Masters had a different story. He says he never paid anything for any stock in SPI. He says he "worked for" Showcase Auctions from September 2003 through September 2004. He signed the corporate documents in Ex. 17 when Mrs. Noordam asked him to do so, and only because she asked him to do so. He testified the asserted dates of his signatures (December 2002 for the initial documents and March 2003 for later minutes) are all false, noting again that he worked at the business only after September 2003.

---

[21] Mrs. Noordam indicated she was "self" employed as an auctioneer. Ex. 3 at schedule I. She did not assert that she was employed by either SPI or Showcase Auctions.

[22] Plaintiff points out that Mrs. Noordam's advertising for M&M indicated that "We are also licenced auctioneers, doing business as Showcase Auctions in the same building." *See* Ex. 18. Mrs. Noordam denied that this either did or was meant to indicate any personal holding in Showcase Auctions or SPI. The Court understands Plaintiff's point though it appears a lot of reliance is placed on the indefinite pronoun "we."

[23] Thus Defendants would seem to have the Court conclude that Mrs. Noordam's services rendered as an auctioneer were gratuitous. Certainly no income to Mrs. Noordam for her services as auctioneer are shown in the statement of financial affairs for the years 2002 through mid-2004. *See* Ex. 3 at SOFA, response to question 1. The 2003 personal tax return, Ex. 32, makes no clear indication of any such payment, though there is a reference to $1,200.00 of "misc[ellaneous] income" from an unnamed source. *Id.* at Form 1040 - Other income (Statement 01).

MEMORANDUM OF DECISION - 17

O'Masters claims to have never attended any of the corporate meetings described in the minutes and other documents prepared by Mrs. Noordam. He learned of matters related to the business as asserted in these documents only when she later asked him to sign what she prepared. He says that occurred in a meeting with Mrs. Noordam in a parking lot outside a fast food restaurant just days before O'Masters' deposition was taken by Plaintiff, and that he was given the documents by Mrs. Noordam to take with him to that deposition.

O'Masters testified that he had no access to the books and records of SPI, and he had no check signing authority, but Mrs. Noordam had both.[24] O'Masters indicated that he never dealt with any corporate ownership of SPI on his income taxes, but instead received just ordinary wage income for his work at Showcase Auctions, and showed it as such on his returns.[25]

At the end of August 2004, O'Masters left Showcase Auctions. He says he

---

[24] No bank records for any Showcase Auctions' accounts (including the one referred to on Defendants' schedule B) were introduced. A number of checks were introduced from the M&M Operations Trust Account that were written payable to Mrs. Noordam, "cash," third parties or M&M, each with a memo notation that they were for or related to "Showcase." *See* Ex. 26. These checks bear dates from December 2002 through mid-2003. *Id.* Mrs. Noordam signed all such checks with the exception of one signed by Mr. Noordam. *Id.*

[25] O'Masters' tax returns and supporting documents might have shed light on the parties' disputed versions of events. But the same were not offered by either side.

MEMORANDUM OF DECISION - 18

was terminated due to Cord's jealousy of him.[26]

When called in rebuttal, Mrs. Noordam flatly contradicted O'Masters' testimony concerning the corporate documents. She testified the documents were executed on the dates indicated. She argued that, since she was the one who fired O'Masters, he was angry with her and motivated to lie on the witness stand. She also indicated that O'Masters had been employed by M&M, thus accounting for his testimony about receiving wage checks (and, presumptively, for why she had the ability to terminate his employment.)[27]

Plaintiff argues that the weight of the evidence establishes that SPI "dba" Showcase Auctions was owned by Defendants and that their ownership was concealed. While the Court agrees there was evidence supporting this view, there was not preponderating proof. Additional discussion is in order.

Initially, the testimonial dispute between O'Masters and Mrs. Noordam presents quite a challenge. O'Masters' credibility was directly attacked in rebuttal, and he was not recalled to address those assertions.

---

[26]  O'Masters testified that, at the time he was terminated, the following businesses were in the Showcase Building at 12551 Government Way in Hayden Lake: Showcase Auctions, M&M Realty, M&M Escrow Service, RV's Northwest, and ABC Management Service. The last, he indicated, was Stephanie Priel's business.

[27]  Since no records from Showcase Auctions' bank account were offered, its payment of O'Masters was not proven. Of the number of checks written by Mrs. Noordam on the M&M account to various entities with the notation "Showcase" on them, none were payable to O'Masters. *See* Ex. 26.

MEMORANDUM OF DECISION - 19

However, Mrs. Noordam's credibility was also repeatedly challenged by Plaintiff, both expressly and implicitly, over the entire course of the trial. All in all, the evidence indicated that Mrs. Noordam was closely involved with all the businesses – including Showcase – and their day-to-day affairs and financial transactions. The MAR and M&M business were closely held and continued what had been up to 1999 Defendants' proprietorships. These businesses and Showcase were run from the same physical location, and business mail was sent to the same one or two addresses used by Defendants. Mrs. Noordam wrote voluminous checks, and had intimate knowledge of the financial affairs of all three businesses even if others assisted with the books. No other individuals were shown to have been employed as active managers or with anything approaching Mrs. Noordam's familiarity with the details of the financial transactions of these businesses.

Notwithstanding Mrs. Noordam's knowledge, at times she claimed not to recall or to have forgotten important details, or was otherwise unclear about them. Yet, at other times, she was quite certain and resolute in her testimony. Given Mrs. Noordam's close involvement with the finances and business operations, the Court found several of her answers to clearly relevant questions vague and evasive. The Court was not persuaded that someone of Mrs. Noordam's obvious intelligence and experience, having been directly responsible for and an active

MEMORANDUM OF DECISION - 20

participant in significant financial transactions and matters for several businesses,

could at times be as imprecise or unknowledgeable about actual details.

The Court therefore finds it hard to adopt, unquestioningly, either of these

witnesses' testimony about SPI.  Determining the true ownership of the business

therefore turns to other evidence, corroborating and impeaching, that was

introduced.  Unfortunately for Plaintiff, that additional evidence was itself limited

and equivocal, even though he did establish that Mrs. Noordam was intimately

involved with SPI and Showcase.[28]

At end, despite raising several serious questions regarding SPI, Plaintiff did

not ultimately prove the *specific* contention that Defendants owned it.  The Court

is unable to find the cause of action under § 727(a)(2)(A) established on the basis

that Defendants actually owned, and concealed their ownership of, SPI.

### ii.  Showcase Auction & Realty, Inc.

A second business generally making up "Showcase Auctions" is Showcase

---

[28]  There was a considerable flow of funds from the M&M bank accounts to or for the benefit of Showcase.  *See* Ex. 26 (checks issued between Dec. 14, 2002 and Oct. 27, 2003, totaling $39,895.95 with memo notations indicating Showcase).  Virtually all the checks were signed by Mrs. Noordam.  This was all during a period when Defendants were sole owners of M&M.  *See* Ex. 15 (sale of partial interest in M&M occurring on Dec. 31, 2003).  As will be discussed later, Defendants argue that some funds were "loans" to Showcase by MAR, though inadequate documentation was produced to prove this contention, and no obligation of Showcase to MAR is shown in MAR's balance sheet attached to Defendants' schedule B.  *See* Ex. 3.

MEMORANDUM OF DECISION - 21

Auction & Realty, Inc. ("SARI").[29]  It was incorporated on November 1, 2004.

*See* Ex. 22.[30]  SARI was incorporated *after* Defendants' June, 2004 bankruptcy

filing.  Plaintiff thus implicitly argues that SARI's *predecessor* business was one

in which Defendants had an ownership interest.  He notes that SARI operated out

of the same facility as Defendants' other business ventures at 12551 Government

Way, and that there are indications or suggestions that this was but one of several

of Defendants' businesses.[31]

     However, the Court concludes that Plaintiff also ultimately failed to prove

this specific proposition.  One problem is that Plaintiff did not establish what the

pre-incorporation business of SARI consisted of, something important if

Defendants are alleged to have fraudulently concealed an interest (as proprietor,

---

[29]  Mrs. Noordam testified SARI was a real estate firm owned by Cord.  She indicated she was a real estate broker (as well as an auctioneer) and that Cord was a real estate agent.  This business in large part focused on development and sale of resort lots and property.

[30]  The articles of incorporation are signed by Cord alone; Mrs. Noordam's name or signature do not appear.  Ex. 22.  Cord's signature was attested to by notary Stephanie Priel.  *Id.* (Priel is a long time employee and associate of Defendants, and was involved in a December 2003 purchase of 51% interest in, and certain escrow accounts of, M&M.  *See* Ex. 15.)  Aware that these post-bankruptcy corporate documents appear to show only Cord's interest, Plaintiff argues they are sham.

[31]  For example, he notes that the mailing address used by Cord on SARI's certificate of assumed business name and with the Idaho Real Estate Commission is P.O. Box 977, Hayden, Idaho, the same post office box used by Defendants' businesses and corporations.  *See* Ex. 22, 24; *see also* Ex. 9, 10, 26, 28 (M&M checking accounts, using post office box address); Ex. 15 (M&M sale contract, using same address); Ex. 11 (Miracles' 2003 tax return signed by Mrs. Noordam, using same address).

MEMORANDUM OF DECISION - 22

partner or otherwise) in such a business at the time they filed their petition on June 2, 2004.[32]

One inference, certainly, is that Mrs. Noordam owned as well as effectively ran any and all preincorporation auction and real estate businesses, whether under SPI or otherwise.  Plaintiff appears to urge the idea that the corporate forms, and O'Masters and Cord, were used by Defendants as facades for their ownership and control of the businesses.  But by the end of the trial these essentially remained inferences, not facts established with requisite certainty.

Cord is intimately tied to many of these issues.  Plaintiff did not call Cord as a witness.  Plaintiff did, however, attempt to prove its cause by referring to the filings in Cord's own bankruptcy proceeding, Case No. 04-20844-TLM.  *See* Ex. 13.[33]

---

[32]  If the idea was that SARI sprang not from a prior "Showcase" but from SPI, Plaintiff's contentions about Defendants owning SPI and concealing that ownership have already been found not proven.

[33]  The Court has recognized that statements made in sworn bankruptcy schedules can be treated as evidentiary admissions under Fed. R. Evid. 801(d).  *See*, *e.g.*, *In re Bauer*, 04.1 I.B.C.R. 38 (Bankr. D. Idaho 2004) (citing *In re Webb*, 03.1 I.B.C.R. 25, 26 (Bankr. D. Idaho 2003)).  There is a problem with use of that proposition in connection with Cord's schedules.  He was not a witness, thus Rule 801(d)(1) (prior statement by witness) is not applicable.  And Cord was not an adverse party to Plaintiff in this litigation, rendering Rule 801(d)(2) (admission by party-opponent) inapplicable.  The Court's approval of the use of schedules, etc. as admissions has occurred in cases where the adverse party is the debtor, and it is the debtor's own statements in the schedules, signed under penalty of perjury, which have been urged to the Court as relevant direct evidence.  That is not the situation here.  The theory therefore does not provide much assistance to Plaintiff, even though Cord's bankruptcy documents were admitted without any objection by Defendants.

MEMORANDUM OF DECISION - 23

Cord filed a chapter 7 petition for relief on June 4, 2004, just two days after Defendants filed their petition.[34]  Plaintiff observes that Cord listed on his personal property schedules no business interests, whether as a proprietor, corporate stockholder or partner in a partnership.[35]  *Id.* at schedule B.  He listed no executory contracts or lease agreements.  *Id.* at schedule G.  Cord merely indicated he was a "self" employed realtor who was "licensed under M&M Realty" and had been for 3 years.  *Id.* at schedule I.

The accuracy or inaccuracy of Cord's filing is not clearly relevant, much less determinative, to Plaintiff's claims that Defendants falsified their ownership of Showcase Auctions (either SPI or SARI, or their predecessors).  Particularly in the absence of Cord's testimony, which the Court could evaluate for credibility and weight, care must be taken not to assume too much from the inconsistencies between Cord's bankruptcy filing and Defendants' bankruptcy filing.  Plaintiff did not show that what Cord may have said or failed to say in his bankruptcy

---

[34]  Unlike the Fed. R. Evid. 801(d) situation addressed *supra* note 33, the Court can take judicial notice of the fact of Cord's bankruptcy filing.  Fed. R. Evid. 201.

[35]  Of course, the question of whether Cord (or Defendants for that matter) owned a "corporate" interest in SARI would not arise until November, 2004 when SARI was incorporated, and thus no bankruptcy disclosures of corporate ownership would be expected in June 2004.  That Cord and Defendants ran a predecessor business as a partnership was not proven.  Cord did, however, have an interest in Miracles prior to his June 4, 2004 bankruptcy filing, as reflected by Ex. 11 (2003 Miracles' tax return) and Ex. 12 (corporate documents).  He disclosed no such interest in his bankruptcy.  But the veracity of *Cord's* bankruptcy disclosures about Miracles are not presently at issue.

MEMORANDUM OF DECISION - 24

pleadings mattered (even assuming the Court could properly consider such statements and omissions as affirmative evidence).

The Court concludes the § 727(a)(2)(A) cause predicated on a concealed actual ownership of SARI (or, rather, its preincorporation business) cannot be sustained.

### b.  Miracles, LLC

Defendants admitted owing 50% of Miracles, a limited liability company that did business as Happy Days Daycare.  Ex. 3 at schedule B (item 12).

Miracles was formed in November 1998 by Cord.  *See* Ex. 12.  On the date of incorporation, the mailing address of the entity, and Cord's address as registered agent, was 200 West Hanley in Coeur d'Alene, Idaho.  *Id.*  The company was administratively dissolved on February 17, 2000, but then reinstated in October, 2000.  *Id.*  The documents related to this reinstatement indicate that Cord was the president and Mrs. Noordam was the secretary.  In the 2000 reinstatement, the mailing address for the business was changed to Defendants' Sunburst Property, as was Cord's address as registered agent.  *Id.*[36]

---

[36]  The annual report form for the following year, 2001, was consistent with the 2000 reinstatement insofar as the address for the business and registered agent.  The 2002 annual report deleted the Sunburst Property address as Miracles' mailing address, replacing it with P. O. Box 977, Hayden, Idaho, the main mailing address for Defendants' businesses as discussed previously.  The 2003 report changed Cord's address as registered agent from the Sunburst Property to 12551 Government Way in Hayden, the site of Defendants' other businesses.  This 2003 report shows the business address for Miracles, and the mailing addresses for Cord and Mrs. Noordam as officers, as P. O. Box 977.  *See* Ex. 12.

MEMORANDUM OF DECISION - 25

While Mrs. Noordam was therefore involved with Miracles since at least the time of the October 2000 reinstatement, it is not clear precisely when she and Mr. Noordam gained their ownership interest in Miracles.[37]  A 2003 partnership tax return for Miracles, however, indicated that the company ran a childcare service business, and that this business started on January 1, 2003.  Ex. 11 at 1.[38] This return indicated that Mr. and Mrs. Noordam each had a 25% interest in the limited liability company, and Cord had a 50% interest.  *Id.* at schedules K-1.

Defendants claimed in their June 2004 bankruptcy filing that their interest in Miracles was valueless.  Ex. 3 at schedule B (item 12).  The 2003 tax return for Miracles reflected a $26,276.00 net operating loss on total income of $38,736.00, and a balance sheet showing a negative equity of $1,276.00.  Ex. 11 at 1, lines 8, 22; and at schedule L, line 22.[39]

---

[37]  Mrs. Noordam testified in her deposition of July 9, 2004, that Miracles "is a limited partnership that we started with another person to run a day care.  And Happy Days Child Care is the only thing that they do."  Ex. 6 at 8.

[38]  Some testimony indicated that Cord had conducted other business(es) under or through Miracles before Mrs. Noordam became involved and the reinstatement occurred. Whether some sort of business was conducted under the reinstated limited liability company before the day care operations commenced is unclear, as is the date the day care business actually started.

[39]  The negative equity resulted from limited depreciable assets, a negative cash position, and $25,000.00 of "mortgages, notes and bonds payable in more than 1 year."  Ex. 11 at schedule L.  The operating loss of $26,276.00 for 2003 was reflected on Defendants' schedules K-1, with each showing a loss of $6,569.00 (25% of the total net loss).  Ex. 11.  Defendants' 2003 personal tax return does not appear to refer to this loss or to Miracles in any fashion, though it does disclose $9,000.00 of rental income on the Sunburst Building.  Ex. 32 at schedule E.

MEMORANDUM OF DECISION - 26

The daycare Miracles operated was located at the Sunburst Property owned by Defendants. Miracles' 2003 tax return showed $9,000.00 of rent expense paid by the business that year. Ex. 11 at 1, line 13. The word "error" was hand written next to this entry. *Id.*[40] When this notation was made was not clear, though Mrs. Noordam unequivocally testified that Miracles paid no rent on the Sunburst Property in 2003.[41] It is undisputed that the statement of financial affairs in Defendants' bankruptcy never reflected any gross income from Miracles or from the leasing of the Sunburst Property.

Other than the tax return, Ex. 11, no financial documents of Miracles were introduced into evidence. It does appear, however, that checks were regularly written by Mrs. Noordam on the M&M accounts to third parties on behalf of the daycare. *See* Ex. 10 (numerous checks totaling $16,255.87 dated from Nov. 2002 through Nov. 2003 bearing memo notations of "daycare," "Dcare" or "D/C").[42]

On June 11, 2004, just nine days after Defendants' bankruptcy filing, Miracles sold its daycare business to Misty Krous. *See* Ex. 14. Under this

---

[40] No such notation appears in schedule E of Defendants' personal tax return, Ex. 32, where the same $9,000.00 rental income figure is referenced.

[41] Mrs. Noordam admitted she was the bookkeeper for Miracles. The documents reflect she signed both the Miracles and personal tax returns, each of which attested to the $9,000.00 in rent. Ex. 11, 32.

[42] Many of these M&M checks appear to pay operating expenses of the daycare. Some appear to pay real property expenses for the Sunburst Property, which Defendants owned. Some appear to pay daycare employees. A few of these checks were actually written with Happy Days Daycare as payee, and one of these indicates it was a "loan" to the daycare. *Id.*

MEMORANDUM OF DECISION - 27

agreement, the sales price of the business was $30,000.00 ("as agreed and . . . not

necessarily substantiated by income statements or tax returns").  *Id.* at 1.  The

amount was payable through or under an escrowed promissory note.  The

payments by Krous on the note "shall be immediately assigned to make payments

to lenders who provided operating capital."  *Id.*

The "lenders" who provided the "operating capital" to Miracles were not

identified in this agreement, though the amount owed them was stated to be

$27,000.00.  *Id.* at 1.  Miracles' 2003 tax return does not shed any light on who

was owed this debt.[43]  In fact, the only reference to the "lenders" in the

documentary evidence is the comment, in Defendants' September 2004

amendments to their schedules, that the obligation was owed to MAR.  *See* Ex. 8 at

SOFA, response to question 10 ("[Agreement] was Miracles *would repay MAR*

$27,000.00.") (emphasis supplied).  Mrs. Noordam's previous deposition

testimony appeared to confirm that Miracles owed only MAR, though she

explained that MAR initially borrowed money from several "investors" and that

these funds were thereafter lent by MAR to Miracles.  *See* Ex. 6 at 24-27.[44]

---

[43]  This return, Ex. 11, shows on schedule L (balance sheet) a $25,000.00 debt payable in
1 year or more.

[44]  Mrs. Noordam indicated in her deposition that a note from Miracles to MAR existed.
*See* Ex. 6 at 26.  Defendants' balance sheet for MAR in their initial schedules showed total assets
of $954,114.00 consisting of real estate owned and notes receivable.  None of the disclosed notes
receivable, however, are from Miracles.  *See* Ex. 3 at schedule B.  The only proof of funds
flowing into the daycare were the checks from M&M.  *See* Ex. 10 discussed above.

MEMORANDUM OF DECISION - 28

The purchaser, Krous, also committed in this agreement to continue the daycare's lease on the Defendants' Sunburst Property "at least until [the] note payable to Miracles (assigned to investors) is satisfied." *Id.* at 1.  As noted, Defendants were and are the owners of the Sunburst Property.  *See* Ex. 3 at schedule A.  They were also the lessors of that building to Miracles for the daycare operation.  *See* Ex. 32 (Defendants' 2003 tax returns) at schedule E.[45]

Mrs. Noordam signed this sale agreement, Ex. 14, on behalf of Miracles.[46] The agreement appears to be drafted by Mrs. Noordam, and it makes a number of references to Defendants' personal bankruptcy, many of which (like the reference, quoted above, that the $30,000.00 purchase price was not necessarily substantiated by tax returns or income statements) can be viewed as self-serving.  *Id.*[47]

---

[45]  Defendants did not, however, show any lease interests on their initial bankruptcy filing.  *See* Ex. 3 at schedule G (calling for disclosure of unexpired leases, and an indication of whether debtor is lessor or lessee).

[46]  There was no proof offered as to Mrs. Noordam's ability to sell the sole business operation of Miracles, LLC in this fashion.  She owned only 25% of the business.  Her husband did not sign the agreement, Ex. 14, and Cord, who owned 50% of the business, did not sign the agreement.  Furthermore, Cord's chapter 7 case was filed on June 4, 2004.  It was closed in October 2004.  The documents from that file admitted into evidence contain no references to Cord's 50% ownership in Miracles.  *See* Ex. 13.  Cord's 50% interest would have been property of the estate subject to the control of his trustee at the time Mrs. Noordam signed Ex. 14.  In fact, Cord's interest would remain property of the estate notwithstanding closing of Cord's bankruptcy case because this asset was never disclosed.  *See In re Killingsworth*, 04.3 I.B.C.R. 88, 89 (Bankr. D. Idaho 2004); *Mire v. Ankersmit (In re Ankersmit)*, 03.1 I.B.C.R. 70, 74 (Bankr. D. Idaho 2003).

[47]  Defendants had just filed a bankruptcy in which they indicated their interest in Miracles was without any value whatsoever.  A sale occurring just days after the petition would clearly raise issues about the accuracy of that representation.  Thus, the inclusion of the remark in the sale agreement casting aspersions on the factual support for the amount Krous agreed to pay

(continued...)

MEMORANDUM OF DECISION - 29

While once again Plaintiff has raised a number of serious and legitimate concerns, his specific contention that Defendants concealed their prebankruptcy interests in Miracles in contravention of § 727(a)(2)(A) was not established. Defendants did in fact disclose their 50% ownership of Miracles on schedule B, and their assertion that this interest lacked value is at least facially substantiated by the tax returns. *See* Ex. 11 at schedule L (showing negative business equity and negative capital accounts).

But while Plaintiff may not have established that § 727(a)(2)(A) was violated, by virtue of a transfer or concealment of property of the debtor in the year preceding filing, the described conduct in regard to Miracles is relevant to, among other things, § 727(a)(2)(B), which will be discussed further below.[48]

---

[47](...continued)
(and another remark asserting that "Sellers will not receive any profit") is, under the circumstances, perhaps not very surprising.

[48] There is one other transfer raised by Plaintiff under § 727(a)(2)(A). Both Defendants signed a warranty deed on January 10, 2004 conveying property known generally as "Parcel 7B - Steppingstones" from themselves as grantors to their solely owned corporation MAR. *See* Ex. 30. This deed was recorded on February 6, 2004. *Id.* Both the granting and the recordation occurred within six months of Defendants' bankruptcy. They did not disclose this transfer. *See* Ex. 3 at SOFA, response to question 10. On August 30, 2004, they amended their statement of affairs to disclose the transfer. Ex. 7. That disclosure stated the transfer was done "to clear title when Parcel 7B was sold." *Id.* This parcel is apparently adjacent to or near Defendants' residence, which is located on Parcel A - Steppingstones (1645 E. Boekle, Rathdrum, Idaho). *See* Ex. 3 at schedule A. Though clearly a prima facie question is raised, Plaintiff failed to provide sufficient additional evidence to satisfy the several elements of § 727(a)(2)(A) to support a denial of Defendants' discharge for the initial failure to disclose this transfer. However, the issue will surface again in connection with § 727(a)(4)(A), *infra*.

MEMORANDUM OF DECISION - 30

### C.  Cause of action under § 727(a)(2)(B)

Plaintiff referred generally to "§ 727(a)(2)" in his complaint, and alleged a post-petition concealment of property of the estate.  *See* Adv. Doc. No. 1 at 5, ¶ III(2).  Plaintiff further alleged a post-petition sale of Defendants' interests in Miracles without disclosure.  *Id.* at 5, ¶ II(10).

### 1.  Standards

Section 727(a)(2)(B) provides that a discharge shall be denied if "the debtor, with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed . . . or concealed, or has permitted to be transferred, removed . . . or concealed . . . property of the estate, after the date of the filing of the petition[.]"  The differences in the two subsections of § 727(a)(2) concern the nature of the property at issue and the timing of the challenged conduct, *i.e.*, property of the debtor before bankruptcy (under subsection (a)(2)(A)) and property of the estate after bankruptcy (under subsection (a)(2)(B)).  The interpretive standards, such as proof of knowledge and intent, are the same.

### 2.  Facts and application of standards

Plaintiff objects to the lack of Defendants' disclosure of the post-petition sale of the daycare business by Miracles to Krous.  He complains that the failure to make any disclosure about this sale from the time it occurred, in June 2004 shortly

MEMORANDUM OF DECISION - 31

after filing, until the amendments in September, 2004, *see* Ex. 8, amounts to "concealment."

The situation is interesting.  On the one hand, Defendants' interest in Miracles at the time of filing (*i.e.*, a 50% equity position) apparently remains the same.  That is to say, while Defendants' ownership interest in the LLC became property of the estate, the sale to Krous did not vary Defendants' percentage ownership of that LLC.

On the other hand, instead of an allegedly valueless interest in an operating business with negative cash flow, Defendants now have a 50% in interest in an entity that no longer conducts its own operations but instead has a $30,000.00 note payable from Krous and a commitment from Krous to pay the post-June 2004 debts of the business.  That the value of Defendants' 50% interest in the LLC – which interest is clearly property of their chapter 7 estate – remained the same after June 11 as it did before that date is not clearly established.  Little evidence was presented on the point.

The Court concludes that it need not resolve this "valuation" question in order to address § 727(a)(2)(B).  It is clear the statute was otherwise violated.

Mrs. Noordam here undertook a transaction, as a member of Miracles, at a time when *all* her and her husband's interests in Miracles were under the sole

MEMORANDUM OF DECISION - 32

control and authority of their bankruptcy trustee.[49]  She was not at that time free to

act in this fashion.

Moreover, though Mrs. Noordam was directly involved in this transaction

and executed the agreement mere days after the petition's filing, the amendments

to the schedules and statements did not occur for months.  The delay was not

persuasively justified or explained.  There was no proof that the trustee was aware

of the transaction or was advised by Defendants until the formal amendments were

made.  The amendments came only after the Rule 2004 examinations and the filing

of the complaint herein.[50]

What the amendments disclosed, when they were filed, is also relevant.

The amended statement of financial affairs indicates a transfer of "Happy Days

Daycare" to Krous, and that Krous:

> indicated she would run the business but not make any pyts [payments]
> & wouldn't pay rent as building is in foreclosure.  No rent amt
> [amount] discussed[;] that will be up to new owner of bldg [building]

---

[49]  The other 50% of the ownership of the business was held by Cord's trustee.  *See supra*
note 46.

[50]  As mentioned above, there is language in the agreement "hedging" about the support
for the $30,000.00 sales figure.  These comments could be read as evidencing Mrs. Noordam's
awareness of how the sale might look when contrasted to Defendants' bankruptcy disclosures.
Additionally, the agreement also included an acknowledgment that "one of the primary members
of Miracles is in a personal bankruptcy" and that "the same member (Noordam) personally owns
the building" in which the business operated.  Ex. 14 at 1-2.  These references establish Mrs.
Noordam's awareness of the pendency of the bankruptcy case and the relationship or connection
of the sale to the bankruptcy.  But no disclosure was made of record in Case No. 04-20823-TLM
until September 21.  *See* Ex. 8.  This supports the conclusion that the conduct was done with the
knowledge and intent to hinder, delay or defraud a creditor or the trustee.

MEMORANDUM OF DECISION - 33

> after foreclosure.  Agrmt [Agreement] was Miracles would repay MAR
> $27,000.

*See* Ex. 8 at amended SOFA, response to question 10.[51]

This conveys the idea that Krous would make no payments to Miracles and pay no rent to Defendants.  However, the agreement itself stated that payments were to commence in September 2004, and those payments would be immediately assigned to Miracles' "lenders" (though it now seems Defendants' contend the only lender was MAR); that "[Krous] is aware that her payments relieve those debts and therefore it is important that her payments be made in a timely manner;" that payments of operating debts by Krous would commence in June 2004; and that Krous agreed to continue the payments to Defendants on the lease for the duration of the note obligation (and not relocate the daycare business until the note was paid), though the rent would be "waived" until September 2004 "as consideration for the involvement in the legal proceedings."  Ex. 14.

Defendants personally owned the Sunburst Property.  They were the ones leasing it to Miracles, a § 101(31)(A)(iv) insider of Defendants (though that lease was not disclosed in Defendants' schedules) and, subsequent to bankruptcy, leasing it to Krous under the June 11 agreement, Ex. 14.  The Sunburst Property

---

[51] The assertion that the property was "in foreclosure" was not accurate.  Any prebankruptcy foreclosure process was stayed by the June 2 filing.  (And Defendants disclose no such foreclosure.  *See* Ex. 3 at SOFA, response to question 5.)  One secured creditor, Keith Helmhout, obtained relief from the § 362(a) automatic stay on September 29, 2004.  *See* Case No. 04-20823-TLM at Doc. No. 24.  This was subsequent to Defendants' September 21 amendments.  It appears some rent would be paid or payable prior to completion of foreclosure.

MEMORANDUM OF DECISION - 34

was property of Defendants' estate under § 541(a).  The "[p]roceeds, product, offspring, rents, or profits of or from property of the estate" are also property of the estate under § 541(a)(6).  Defendants had no ability to enter into transactions regarding this property; that was the trustee's sole right.  *See* § 704(1); *see also* § 521(4) (requiring debtors to surrender to trustee all property of estate and all books and records related thereto).  They had no ability to collect, or waive, rent.

The Court concludes from the evidence presented that Mrs. Noordam did in fact transfer and conceal property of the estate from the trustee, the officer charged with its custody.[52]  Under the totality of the evidence, including inferences reasonably drawn from the course of conduct described, the Court concludes the conduct of Mrs. Noordam was knowing and fraudulent.  The cause of action against her under § 727(a)(2)(B) is found well taken and her discharge will be denied.[53]

---

[52]  What the trustee knew or was told of these matters regarding Miracles and the Sunburst Property is not clear.  He was not called to testify.  The Court has no proof that the trustee was told anything other than what appeared in the otherwise problematic disclosure in the amended SOFA of September, 2004.

[53]  Discharge issues must be addressed in connection with each joint debtor, and it is not invariably true that conduct of one debtor can necessarily be attributed to the other.  *See*, *e.g.*, *Cox v. Lansdowne (In re Cox)*, 904 F.2d 1399 (9th Cir. 1990), discussed below; *see also Sterling Int'l, Inc. v. Thomas (In re Thomas)*, 2003 WL 21981707, 03.3 I.B.C.R. 178, 184-85 (Bankr. D. Idaho 2003) (addressing § 727(a)(3) issues); *accord Wells Fargo Bank Northwest v. Covino (In re Covino)*, 04.3 I.B.C.R. 98, 104-05 (Bankr. D. Idaho 2004) (discussing, in the context of § 523(a)(2)(A), which also has a fraudulent intent element, the decision of *Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa)*, 258 B.R. 192, 198 (9th Cir. BAP 2001), which noted that a marital union alone cannot serve as a basis for imputing fraud from one spouse to the other).  Evidence that Mr. Noordam had knowledge of the above described transactions surrounding the
(continued...)

MEMORANDUM OF DECISION - 35

### D.  Cause of action under § 727(a)(3)

#### 1.  Standards

In order to sustain a claim under § 727(a)(3), Plaintiff must show by a preponderance of the evidence "'(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions.'" *Leimbach v. Lane (In re Lane)*, 302 B.R. 75, 83, 03.4 I.B.C.R. 213, 216 (Bankr. D. Idaho 2003) (quoting *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1296 (9th Cir. 1994)).  If Plaintiff's proof satisfies these elements, the burden shifts to Defendants to justify or provide a credible explanation for the failure or inadequacy.  *Id.* (citing *Cox*, 41 F.3d at 1296-97).

These issues were discussed at length in *Thomas*, 03.3 I.B.C.R. at 182-84. *Thomas* recognized that "financial disclosure is a *sine qua non* for bankruptcy relief."  *Id.* at 182.  It cited with approval *In re Connors*, 273 B.R. 764, 769-70 (S.D. Ill. 2001), which held that § 727(a)(3) "requires as a precondition to discharge that the debtor produce records which provide creditors with enough

---

[53](...continued)

Sunburst Property and rents was lacking.  While he is certainly charged with any inaccuracies in the schedules (*e.g.*, the failure to list the lease on schedule G, the failure to disclose rents received in 2003 on the statement of financial affairs, etc.), § 727(a)(2)(B) requires proof of knowledge and fraudulent intent in connection with the transfer or concealment of property of the estate. Proof of Mr. Noordam's knowledge and intent was lacking.  Plaintiff may not recover judgment against Mr. Noordam under this provision.

financial information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Id.* at 183 (emphasis and other citations omitted).[54] *See also* 6 Collier on Bankruptcy, ¶ 727.03[3][a], 727-31 (Alan N. Resnick & Henry J. Sommer, eds., rev. 15th ed. 2004) (citing *In re Juzwiak*, 89 F.3d 424 (7th Cir. 1996)).

The Ninth Circuit discussed the policy and operation of § 727(a)(3) in its *Cox* decisions.  It held that "the purpose of [§ 727(a)(3)] is 'to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs.'" *Cox. v. Lansdowne (In re Cox)*, 904 F.2d 1399, 1401 (9th Cir. 1990) (quoting *In re Underhill*, 82 F.2d 258, 260 (2d Cir. 1936) (Act case)).[55] *Cox* further noted: "'Creditors are not required to risk the withholding or concealment of assets by the bankrupt under cover of a chaotic or incomplete set of books or records.'" *Id.* at 1401 (quoting *Burchett v. Myers*, 202 F.2d 920, 926 (9th Cir. 1953)).[56]

---

[54] *Thomas* quoted at length from *Connors* in regard to the policy and operation of § 727(a)(3).  *See* 03.3 I.B.C.R. at 183.  The Court reaffirms its acceptance of *Connors*' analysis and incorporates that discussion by reference.

[55] This, the first *Cox* decision, affirmed the bankruptcy court's ruling that the records were inadequate, but reversed and remanded for consideration of whether the debtor, Mrs. Cox, had relied on her husband to keep business records and thus justified her failure within the contemplation of § 727(a)(3).  The second *Cox* decision is the one at 41 F.3d 1294, previously cited.

[56] Neither a trustee nor a creditor has the burden to sift through hundreds of documents before any sense can be made of them.  *See Peterson v. Scott (In re Scott)*, 172 F.3d 959, 970 (7th Cir. 1999) (holding trustee did not have to undertake "Herculean effort" to reconstruct the

(continued...)

MEMORANDUM OF DECISION - 37

The Court in *Thomas* held that the "magnitude and degree" of records would vary based on the debtor's circumstances.  *Id.* at 183.  "For example, a debtor engaged in business may justly be expected to maintain more detailed and comprehensive records than a consumer not engaged in business."  *Id.* (citing *Connors*, 273 B.R. at 772, and *Cadlerock Joint Venture, L.P. v. Cacioli (In re Cacioli)*, 285 B.R. 778, 783 (Bankr. D. Conn. 2002)); *accord Wynn*, 261 B.R. at 300 (holding a corporate or a business debtor should be held to a higher level of accountability in record keeping).

The Court further found and concluded in *Thomas* that "in situations where the facts indicate that a debtor exercised control over and conducted business through a closely held corporation, § 727(a)(3) inquiries cannot be artificially limited to those records that are, strictly speaking, those of the debtors" and that the financial records (or absence of records) of those other entities are also material and relevant.  *Id.* at 184.

## 2.  Facts and application of standards

The initial burden was on Plaintiff to show that Defendants failed to maintain and preserve adequate records and that such failure makes it impossible to ascertain their financial condition and business transactions.  *Cox*, 41 F.3d at 1296.  The documentary evidence, and the testimony elicited by Plaintiff in his

---

[56](...continued)
debtor's financial condition); *Juzwiak*, 89 F.3d at 428-29.

MEMORANDUM OF DECISION - 38

case in chief, met this burden.  Defendants' records, placed before the Court by Plaintiff, are inadequate.[57]  Defendants' financial condition and their business transactions clearly could not be ascertained by reference to those records.

The Court is sensitive to the fact that Plaintiff did not purport to introduce every record or piece of financial information that Defendants might have had or that might be obtained from third parties.  But that is not a plaintiff's burden in establishing a § 727(a)(3) case.  The court in *Strzesynski v. Devaul (In re Devaul)*, 318 B.R. 824, 829-33 (Bankr. N.D. Ohio 2004), engaged in an extensive analysis of the question of § 727(a)(3) burdens.  *Devaul* concluded that in order to meet the initial burden, a § 727(a)(3) plaintiff must address three areas.

First, a plaintiff must offer evidence of the general nature of a debtor's business or personal financial position, including business relationships, interests and sources of income, and the types of transactions about which recorded information is sought.  The court noted this proof is not complex and can likely be developed through a debtor's filed schedules, § 341(a) meeting testimony, or Rule 2004 examination.  *Id.* at 833.  This factor obviously assists the court in determining, as discussed in *Thomas*, the context and scope of the § 727(a)(3)

---

[57]  As reflected by the minute entry of the trial, *see* Adv. Doc. No. 18, Plaintiff marked and introduced Ex. 1 through Ex. 36.  After Plaintiff rested, Ex. A was marked and offered by Defendants, but not admitted.  No other exhibits were presented by Defendants.

MEMORANDUM OF DECISION - 39

inquiry, and the degree and magnitude of the records that should reasonably be expected to exist and be kept.

Second, according to *Devaul*, a plaintiff must present evidence identifying what recorded information it alleges was not kept or preserved, or that was concealed, destroyed or falsified. *Id.* at 833. While the nature of evidence on this point will be case-specific, it appears to this Court that the missing records might be identified by category (*e.g.*, checking account records for a separate corporation or business, tax returns and supporting schedules for such a business, account ledgers, balance sheets and income statements, records regarding inter-company debt and transactions, and corroborating materials).

Third, a plaintiff must show how the missing information "might" enable a debtor's actual financial condition or business transactions to be ascertained, which *Devaul* indicates is the "ultimate connection between the first two elements of proof." *Id.* at 833. It notes that in some cases, the nature of the missing recorded information might be so basic as to allow the court to draw the necessary conclusion on its own, without direct evidence. *Id.* This recognizes the obvious: some sorts of records are inherently necessary to ascertaining a debtor's financial condition or determining a debtor's transactions.

*Devaul* indicates that these standards will not generally be hard to meet, and that "Congress' use of the term 'might' [in § 727(a)(3)] emphasizes its

MEMORANDUM OF DECISION - 40

intended lack of rigor in the statutory standard." *Id.* at 834. Furthermore, "the statute recognizes the practical reality that debtor is the gatekeeper of his or her own documents and information. And that is also why the burden then quite properly shifts to the debtor to prove justification under all the circumstances for any missing records[.]" *Id.* (citation omitted).

Since the initial burden was met here, Defendants had to justify the absence of inherently relevant records and information by showing, for example, that (a) the records did in fact exist; (b) they were not actually necessary, in that the debtor's financial condition and business transactions could be fairly ascertained without them; (c) the debtor lacked the sophistication or education necessary to appreciate the need for such records; (d) the transactions questioned were insignificant or otherwise explained; (e) the accidental destruction or loss of records; or (f) some other sort of "justification" for the lack of recorded information. *See Devaul*, 318 B.R. at 834.

The lack of debtors' sophistication is not urged here and is not supported by the evidence, especially as to Mrs. Noordam. The insignificance of the transactions is clearly not an applicable defense. No accidental destruction or loss was alleged or argued.

MEMORANDUM OF DECISION - 41

In regard to the possible defense that records in fact existed, the Court starts by observing that Defendants introduced no records into evidence.[58]  Mrs. Noordam's testimony that other records existed, or an inference that other records might exist (drawn for example from the existence of tax returns or the comments of Defendants' accountant), was not adequate rebuttal.

As mentioned at the outset of this Decision, context matters.  Here, Defendants created two corporations, M&M and MAR, and made wholesale transfers of significant personal assets into those entities.  They did so at a time when Plaintiff was pursuing collection of a debt (albeit a debt Defendants disputed), and Defendants made specific communications to all their other creditors that the movement of business operations and assets into the corporations was designed to prevent Plaintiff's collection of his claim.  The Court noted in *Noordam I* the several problems with Defendants' conduct.  03.2 I.B.C.R. at 139.

At a minimum, the Court's ruling in *Noordam I* and Plaintiff's dogged pursuit should have made it abundantly clear to Defendants that their conduct with and through the several closely held, related and/or controlled entities would be

---

[58]  The allegations of the complaint put Defendants on notice that the quality of their records were at issue.  The pretrial order of the Court entered in November, 2004, Doc. No. 8, required disclosure of exhibits, other than rebuttal exhibits, by January 26, 2005, a week prior to trial.  Plaintiff made his disclosures.  *See* Adv. Doc. No. 15.  (Defendants disclosed only witnesses, not exhibits.  *See* Adv. Doc. No. 12.)  Plaintiff's disclosure served to alert Defendants to the financial records that *Plaintiff* would put before the Court.  Defendants offered no rebuttal exhibits, other than Exhibit A which related to O'Masters' credibility.

MEMORANDUM OF DECISION - 42

closely scrutinized.[59]  The need for competent and complete business and financial

records was self-evident given the context.  And, even without the special context

of this case, debtors such as Defendants who are engaged in several business

endeavors are obligated to keep adequate records in regard to each in order to

meet the burden of § 727(a)(3) in the event they later file for bankruptcy relief.

*Accord Thomas*, 03.3 I.B.C.R. at 183-84 (discussing relevance of records of

closely-held corporate entities).

Finally, the potential defense that additional records were not necessary and

that the debtor's financial condition and business transactions could be fairly

ascertained without them, was belied by the entirety of the evidence.  The record

shows that M&M's Operational Trust Account was used as a general, commingled

account for several of the business.  It was apparently a clearing house if not

funding source for not just its own operations but also for "Showcase" and for

Miracles' daycare business.  While Mrs. Noordam testified that she maintained

"ledgers" so that the financial status and affairs of the several entities could be

---

[59]  In *Mondore v. Mondore (In re Mondore)*, 326 B.R. 214 (Bankr. W.D.N.Y. 2005), the
court commented on what it called the "ex factor" (a reference to ex-spouses, ex-business
partners, ex-friends and others with knowledge about the debtors' affairs and conduct and a
motivation to share that information with the trustee or court).  It stated: "If there is an 'ex' or a
very aggressive, knowledgeable individual creditor in a debtor's history, attorneys for debtors
would be well advised to take additional time with the debtor in preparing their Schedules and
Statements in order to focus them, even more than usual, on the need to be absolutely thorough
and forthcoming when completing, signing and filing their Schedules and Statements."  *Id.* at
219.  While *Mondore* was a § 727(a)(4) case, the idea it discusses applies with no less vigor to
§ 727(a)(3) record-keeping duties.

MEMORANDUM OF DECISION - 43

separated and properly accounted for, no corroborating proof was provided.[60]

Using checks drawn on a commingled account with "footer" notations of purpose, for several businesses of the size and diversity present here, is a wholly inadequate accounting system or process.

Another of Mrs. Noordam's testimonial explanations, that she simply preferred to work in cash and not with banks, is also insufficient.[61]  Even if her claimed personal preference about not using bank accounts is sincere[62] and to be given some consideration, she was then obligated to keep other records, adequate

---

[60]  Her testimony was that as many as 50 or 60 "accounts" were maintained on ledgers in order to keep the businesses' affairs separate, even though all the funds were commingled in the M&M Operations Trust Account.  How this was done, or that it was competently and accurately done, was not shown.

[61]  Mrs. Noordam and the businesses clearly did not religiously avoid banks. Defendants' schedules disclosed several bank accounts.  See Ex. 3 at schedule B, item 2, (listing 6 accounts not including Showcase Auctions).  And there were numerous banking transactions, in substantial amounts and on a regular and consistent basis, evidenced by the checks from the accounts.  For example, Ex. 9 includes checks on an "M&M Realty Services, Inc." account and the "M&M Realty & Escrow, Operations Trust Account" from December 2, 2002 to November 24, 2003, payable to "cash", Mrs. Noordam or M&M.  A number of these were endorsed "For Deposit Only: Merry or Robert Noordam dba M&M Realty & Escrow[,] Acct # 0584 318711." (This was apparently Defendants' personal account.  See Ex. 34.)  One of the checks to "cash" in this exhibit shows an endorsement reading "For Deposit Only  124103799  Happy Days Childcare  7135 717812."  Ex. 9 at 25.  See also Ex. 10 at 40, 43, 45 (checks to "cash", Happy Days, and without payee deposited to account 7135717812); Ex. 26 at 39 (check on M&M Operations Trust Account payable to Showcase Auctions deposited to account 7135717713).

[62]  As noted elsewhere in this Decision, Mrs. Noordam's credibility was not strong.  Her asserted preference for cash could easily have more to do with making it difficult for third parties to comprehend, unravel or track Defendants' financial dealings than with anything else.  And Plaintiff's unyielding pursuit of his claim was similarly a likely motivation.

MEMORANDUM OF DECISION - 44

and sufficient to allow Defendants' financial condition and business transactions

to be ascertained.[63]

On this record, Plaintiff showed that Defendants had a "chaotic [and]

incomplete set of books or records." *Cox*, 904 F.2d at 1401. No reasonably

accurate understanding of Defendants' financial transactions could be derived

therefrom.[64]

---

[63] Bank account statements and documents "may be simple records [but] they 'form the core' of what [is necessary] to ascertain [the debtor's] financial condition, primarily his use of cash assets." *Ochs v. Nemes (In re Nemes)*, 323 B.R. 316, 325 (Bankr. E.D.N.Y. 2005) (quoting *The Cadle Co. v. Terrell*, 2002 WL 22075 at *5 (N.D. Tex. Jan. 7, 2002), *aff'd* 46 Fed. Appx. 731, 2002 WL 1973217 (5th Cir. July 30, 2002)).

[64] In addition to the matters already discussed, another situation is apt illustration of the many problems encountered in deciphering, much less relying on, Defendants' records. On February 13, 2003, a check was issued on the M&M Operations Trust Account for $240,393.31 made payable to "cash" and bearing the notation "#01-Showcase, c/c-Oakwood Bldg." *See* Ex. 28. According to Defendants, these funds were used to purchase the real property at 12551 Government Way. The purchase, they contend, was made by MAR, not M&M. According to Mrs. Noordam, MAR owed secured debt to Danforth of $200,000.00 and to the Binghams of $100,000.00. They explain the absence of the building on the MAR balance sheet of May 24, 2004 attached to their bankruptcy schedule B by indicating that the Binghams "repossessed" the property in October, 2003. That the secured debts existed was not proven. Mrs. Noordam testified that the Binghams and MAR agreed at the time of the acquisition of the property that MAR would "assign" its interest to the Binghams if it could not repay them, and that this was what occurred in October, 2003. MAR (and all Defendants' other businesses) did not lose possession though. On November 15, 2003, the Binghams "leased" the property to MAR for two years at $3,000.00 per month. *See* Ex. 36. A "memorandum" of this lease was signed on November 15 and recorded at M&M's request on May 17, 2004, shortly before the Defendants' bankruptcy filing. *Id.* (Instrument No. 1876426). Immediately afterward, M&M caused to be recorded a December 31, 2003 "assignment" of the lessee's interest from MAR to SPI. *Id.* (Instrument No. 1876427). (This December 31, 2003 lease assignment in Ex. 36 was signed by Cord as SPI's president. However, he was not elected as SPI's president until March 1, 2004. *See* Ex. 17 at 12, 17.) When Plaintiff identified that the County tax rolls apparently showed the property as owned by MAR, Mrs. Noordam said that this was due to the Binghams' failure to record a deed they received from MAR until December, 2004.

MEMORANDUM OF DECISION - 45

In evaluating a § 727(a)(3) objection to discharge, "the court must be mindful of the debtor's obligation in a bankruptcy case to reveal, rather than conceal, the complete financial picture." *Nemes*, 323 B.R. at 325 (quoting *McCord v. Sethi (In re Sethi)*, 250 B.R. 831, 838 (Bankr. E.D.N.Y. 2000)). Dealing in cash and using a commingled checking account does not meet the obligation. Failing to keep and present competent evidence of other accounting documents, such as bank records, tax returns or other corroborating materials does not meet the obligation.[65] A debtor must "produce 'additional credible evidence to rebut the proof of insufficient records, or to justify the absence of records.'" *Nemes*, 323 B.R. at 325 (quoting *Thaler v. Erdheim (In re Erdheim)*, 197 B.R. 23, 29 (Bankr. E.D.N.Y. 1996)). Trustees, creditors and the court are not required to "reconstruct a debtor's financial situation by combing through disorganized piles of paper" nor are they "required, in the absence of adequate records, to take a debtor's word for his financial dealings." *Schechter v. Hansen (In re Hansen)*, 325 B.R. 746, 761 (Bankr. N.D. Ill. 2005) (quotations omitted); *accord Devaul*, 318 B.R. at 840 (indicating, in a § 727(a)(5) context, that whether an explanation

---

[65] As discussed in *Thomas*, the record-keeping and production burden included the records of Defendants' closely held entities. At a minimum this included MAR and M&M. Given the magnitude of ownership and the apparent control of Miracles, this LLC's records are similarly relevant. And, as noted, the checking records in evidence indicate that several business' funds were handled by Mrs. Noordam through the M&M Operations Trust Account. Thus, the ability to document, track and account for all the "inter-company" transfers is also critical. *See In re Transp. Mgmt. Inc.*, 278 B.R. 226, 236-37 (Bankr. M.D. Ala. 2002).

MEMORANDUM OF DECISION - 46

is substantiated by documents is relevant, especially where testimonial assertions do not bear sufficient credibility).

The burden shifted to Defendants and was not met. The consequences of that failure fall on both Defendants.[66] Judgment will be entered for Plaintiff and Defendants' discharge will be denied under § 727(a)(3).

### E. Cause of action under § 727(a)(4)(A)

#### 1. Standards

Section 727(a)(4)(A) provides that the Court shall grant the debtor a discharge "unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."

"The requisite false oath may involve either an affirmatively false statement or an omission from the debtor's schedules." *Searles*, 317 B.R. at 377; *see also Palmer v. Downey (In re Downey)*, 242 B.R. 5, 13, 99.4 I.B.C.R. 165, 168 (Bankr. D. Idaho 1999). The false oath is complete when made. *Searles*, 317 B.R. at 377 (citing *Beauchamp*, 236 B.R. at 732-34). Prompt correction of an inaccuracy or omission may be evidence of a lack of fraudulent intent. *Id.* (citing *Beauchamp*,

---

[66] Mr. Noordam is here as responsible as Mrs. Noordam. First, he is an owner of Miracles, M&M, MAR and the Sunburst Property. He thus shares the obligation to maintain and keep adequate records. Second, there is no intent element for § 727(a)(3). *See Cox*, 41 F.3d at 1296-97 (intent to conceal financial condition not a necessary element of denial of discharge under § 727(a)(3)); *see also Davis v. Wolfe (In re Wolfe)*, 232 B.R. 741, 745 (8th Cir. BAP 1999). The issue of proof of improper intent on the part of each debtor, as discussed above in regard to § 727(a)(2), does not exist under § 727(a)(3). And, third, unlike the spouse in *Cox*, Mr. Noordam did not attempt to show through evidence that his failure to meet the obligations of keeping adequate records was justified through reliance on Mrs. Noordam.

MEMORANDUM OF DECISION - 47

236 B.R. at 733). On the other hand, amendments which flow only from

identification of the error or omission by adverse parties or which follow initiation

of litigation to deny discharge may be viewed differently.

The false statement must relate to a material fact. *Searles*, 317 B.R. at 377;

*Wills*, 243 B.R. at 62-63. Materiality is broadly defined, and a false statement is

material "if it bears a relationship to the debtor's business transactions or estate, or

concerns the discovery of assets, business dealings, or the existence and

disposition of the debtor's property." *Wills*, 243 B.R. at 62. A false statement or

omission may be material even if it does not cause direct financial prejudice to

creditors. *Id.* at 63.

### 2.  Facts and application of standards

Even considering the amendments Defendants made to their bankruptcy

schedules and statement of financial affairs, there are still a number of errors and

omissions.

For example, despite amendment, Defendants have failed to accurately

answer question 1 on the statement of financial affairs regarding the gross income

they received from all sources in the two and half years prior to filing. The Court

appreciates that the inaccuracy is, in part, established by tax returns that were not

completed until after filing. But the original response was not shown to be

MEMORANDUM OF DECISION - 48

accurate or factually supported, and the response was never amended after the
returns were completed.[67]

Defendants disclosures about the Sunburst Property were inadequate.  Their
lease of that property to Miracles was not disclosed on schedule G, and the rental
income from the lease was never disclosed.[68]

There was no initial disclosure of the warranty deed transferring Parcel B-
Steppingstones to MAR in February, 2004.  *See* Ex. 30.  Though clearly required,
this disclosure only occurred later in the August 30 amendments, *see* Ex. 7, which
followed the 2004 examinations of Defendants.

The August amendment added an unsecured creditor, Jameson Mortgage,
with a claim of $54,000.00.  *Id.*  Merry Noordam testified that this obligation
"slipped her mind."  Though amending schedule F in August, it was September

---

[67]  The $18,000 per year shown as historical, prebankruptcy income of Mrs. Noordam in
the SOFA correlates with the $1,500 per month ($18,000.00 per year) she projected after
bankruptcy in schedule I.  *See* Ex. 3.  In an attempt to justify these figures, Mrs. Noordam
testified that she had "drawn" money from MAR and M&M "as needed" and this once averaged
about $1,000.00 per month but increased to $1,500.00 per month.  Even if the "gross income" to
be disclosed in the SOFA response was only that portion of the income generated by the two (or
more) businesses that she elected to "draw" for personal use, the accuracy of the response is not
proven.  Moreover, in her deposition, Mrs. Noordam admitted that she could not identify whether
the money came from M&M, MAR or other businesses.  Ex. 6 at 97.  And the checks introduced
into evidence indicate substantially larger amounts were accessed through checks made payable
to Defendants or signed by Mrs. Noordam and made payable to cash.

[68]  Mrs. Noordam insisted that no actual payment of rent was received in 2003.  This is
belied by the tax returns.  When questioned, Defendants' accountant speculated that the rent may
have been paid through the tenant paying on the underlying debt on Defendants' property.  That
does not make it any the less income, nor was this "alternative" financial transaction proven to
have occurred.  And, as noted earlier in connection with § 727(a)(3), to the extent introduced, the
records are insufficient to verify or corroborate the actual transactions.

MEMORANDUM OF DECISION - 49

before schedule H was amended to show MAR as a codebtor on the obligation.
*See* Ex. 8.[69]

Though a claim owed to Don and Jill Jackson secured by Defendants'
residence was disclosed in the first schedule D, *see* Ex. 3, it was only in the
September amendments that Defendants disclosed in the statement of financial
affairs the details of a transaction with the Jacksons that occurred within the year
prior to filing and gave rise to this claim.[70]  *See* Ex. 8 at amended SOFA, response
to question 10 (requiring disclosure of transfers of debtor's property either
absolutely or as security).  This October, 2003, transfer was described as "$30,000
borrowed from Jacksons, sec[ured] by dot [deed of trust] on debtors' residence;
funds used to pay previous 2nd dot and 3 yrs prop[erty] taxes & repairs to home."
*Id.*  Also the payments made to the Jacksons servicing the secured debt were not
disclosed in response to SOFA question 3 until the August amendments.  *See* Ex.
7.

---

[69]  The $54,000.00 obligation does not appear on the listing of MAR's debts in the
balance sheet attached to Defendants' schedule B.  *See* Ex. 3.

[70]  Defendants emphasize that they did show the Jackson secured debt on the original
schedule D.  However, that entry omitted the required disclosure of the date the claim was
incurred, as did virtually all the entries on the creditor schedules D, E and F.  The dates of
transactions are clearly material, and often critical, in bankruptcy, which is why debtors are under
an obligation of disclosure in their schedules.  And any transfers within a year of filing must also
be explained in detail in response to SOFA question 10 regardless of disclosure of the claim in
the schedules.

MEMORANDUM OF DECISION - 50

The December, 2003 transaction between Defendants and Priel in regard to M&M is disclosed.  However the adequacy of disclosure is debatable.  *Compare* Ex. 3 at SOFA, response to question 10 *with* Ex. 15.

The described errors, inaccuracies and omissions all relate to Defendants' businesses transactions and dealings, their assets and their estate, and are material.

Having faced questions about the accuracy of disclosures of transfers, assets and liabilities in *Noordam I*, Defendants certainly had to appreciate that the filings they made in a later bankruptcy would be scrutinized.[71]  *See Mondore*, 326 B.R. at 219.  Despite an obvious need for absolute thoroughness, candor and accuracy, the problems still exist.

The Court further concludes that the false statements were made by Mrs. Noordam with the requisite intent.  That intent may be, and here is, established by the evidence, circumstantial as well as direct, and inferences drawn from her course of conduct.  *Wills*, 243 B.R. at 64; *Downey*, 242 B.R. at 13.  Context is, again, relevant to the question.  Defendants formed, and then transferred their assets and business operations to, MAR and M&M.  In significant part, this was a

---

[71]  Defendants lost the right to file for bankruptcy relief for one year in *Noordam I*.  The findings supporting that decision included "the *lack of required disclosure of . . . transfers* in sworn bankruptcy submissions [and] the *other errors and omissions* in Debtors' sworn schedules in the 2000 and 2001 bankruptcy filings, rendering their characterization of their financial situation not only incomplete but misleading."  *See* 03.2 I.B.C.R. at 139 (emphasis supplied).  Defendants were thus on notice of the importance of accuracy and completeness in any future bankruptcy filing.  Nevertheless, the schedules in the 2004 case were replete with errors and, even after two amendments, the evidence is that errors still remain.

MEMORANDUM OF DECISION - 51

design to insulate themselves and their property from collection by Plaintiff.  That

Defendants had to keep accurate and appropriate business and personal financial

records was clear.  This was required not only by state law principles, such as

those regarding alter egos and piercing corporate veils, but it was also required to

defend themselves from Plaintiff's allegations that the transfers and the

corporations were sham and part of an ongoing effort to hinder, defraud and delay

him.

In light of § 727(a)(4)(A), there was a clear need, and significant

motivation, for Defendants to accurately and completely disclose all assets and

liabilities, and provide all the information called for in the statement of financial

affairs, in their bankruptcy case – a case that appears to have been almost

inevitable following expiration of the one year prejudicial bar on refiling.  Yet an

approach was taken to the need for full and complete disclosure that can only be

described as cavalier.

This Court previously held that a "reckless disregard of both the serious

nature of the information sought and the necessary attention to detail and accuracy

in answering the schedule's questions may rise to the level of fraudulent intent

necessary to bar a discharge." *Rakozy v. McGary (In re McGary)*, 91 I.B.C.R.

145, 146 (Bankr. D. Idaho 1991); *accord Downey*, 242 B.R. at 13 ("A statement is

made with knowledge if it is known to the debtor to be false, or made without a

MEMORANDUM OF DECISION - 52

belief in its truth, or made with a reckless disregard of its truth."). The Court

further observed:

> The purpose of Section 727(a)(4) is to ensure that dependable
> information is supplied for those interested in the administration of the
> estate, and on which they can rely without the need of the trustee or
> other parties to uncover the true facts by examination or investigation.
> This purpose is not served when disclosure is incomplete, or comes
> only after inquiry by interested parties.

*McGary*, 91 I.B.C.R. at 147 (citation omitted).[72]

Some of the errors and omissions might, if viewed in a vacuum, seem

minor. However, in context and as a whole, they are material within the sense of

the authorities, and reflect the intent required under § 727(a)(4)(A). Mrs.

Noordam by her testimony took responsibility for what was contained in the filed

schedules and statements. For the reasons stated, her discharge will be denied

under § 727(a)(4)(A).

Mrs. Noordam's testimony indicated that while Mr. Noordam was at certain

meetings concerning the bankruptcy filing, he provided none of the information in

the schedules and statements. Plaintiff did not challenge this representation. Mr.

Noordam did not testify.

---

[72] *See also Rasmussen v. Unruh (In re Unruh)*, 278 B.R. 796, 807 (Bankr. D. Minn.
2002) (noting that the function of § 727(a)(4)'s "harsh penalty" is to ensure complete and reliable
information "without the necessity of digging out and conducting independent examinations to
get the facts." (quoting *Cepelak v. Sears (In re Sears)*, 246 B.R. 341, 347 (8th Cir. BAP 2000)).

MEMORANDUM OF DECISION - 53

In one sense, this limits the strength of the § 727(a)(4)(A) case against Mr.

Noordam.  He was not the active manager of the several businesses; the evidence

indicates Mrs. Noordam was.  She, not Mr. Noordam, was the one who signed the

numerous checks, ran the accounts, kept the alleged "ledgers" and handled the

financial affairs for Defendants.  She, not Mr. Noordam, provided the explanation

of the assets, liabilities, transactions and related matters in the SOFA and

schedules.

But Mr. Noordam signed the declaration concerning the schedules,

declaring under penalty of perjury that they were true and correct to the best of his

knowledge, information and belief.  *See* Ex. 3; *see also* Exs. 7, 8 (amendments,

also signed by both Defendants).  He signed the statement of financial affairs,

making the same declaration as to the accuracy of those answers.  *Id.*  Defendants

presented no evidence to support the idea that Mr. Noordam was somehow

excused from the onus of these declarations.  Nothing indicated that he lacked

access to the information or was unfamiliar with the financial affairs, even if Mrs.

Noordam was primarily involved.

Signing bankruptcy declarations is serious business.  Mr. Noordam's doing

so with the number, nature and magnitude of errors and omissions demonstrates

his reckless disregard for how serious it is.  Though a closer case than that

regarding Mrs. Noordam, the Court concludes the requirements for denial of

MEMORANDUM OF DECISION - 54

discharge for false oath under § 727(a)(4)(A) are met in regard to Mr. Noordam, and his discharge will also be denied.

### F.   Cause of action under § 727(a)(5)

#### 1.   Standards

To sustain the claim under § 727(a)(5), Plaintiff must first establish that specific assets are missing.  *Lane*, 302 B.R. at 82, 03.4 I.B.C.R. at 215 (citing *Floret LLC v. Sendecky (In re Sendecky)*, 283 B.R. 760, 765 (8th Cir. BAP 2002); *The Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 618 (10th Cir. BAP 2001)).  If he identifies missing assets, it then becomes Defendants' burden to provide a satisfactory explanation concerning what happened to them.  *Id.* (citing *Sendecky*, 283 B.R. at 766; *Stewart*, 263 B.R. at 618); *see also Thomas*, 03.3 I.B.C.R. at 185 n.30 (additional authorities).[73]

#### 2.   Facts and application of standards

Plaintiff points to Defendants' alleged failure to account for the transfer of their ownership of SPI, or their disposition of the amounts they may have received for that ownership interest.  *See* Adv. Doc. No. 19 at 7.  However, the proof did

---

[73]  Like § 727(a)(3), the provisions of § 727(a)(5) are designed to "relieve creditors and courts of the full burden of reconstructing the debtor's financial history and condition, placing it instead upon the debtor."  *Hansen*, 325 B.R. at 763 (quoting *First Commercial Fin. Group, Inc. v. Hermanson (In re Hermanson)*, 273 B.R. 538, 545 (Bankr. N.D. Ill. 2002)).  If the plaintiff succeeds in showing that the debtor once owned substantial and identifiable assets that are no longer available to creditors, the burden shifts to debtor to satisfactorily explain the unavailability of those assets.  The explanation need not be "far-reaching and comprehensive" but must be more than a "vague, indefinite, and uncorroborated hodgepodge of financial transactions."  *Id*.

not substantiate ownership of SPI, nor any other identifiable Showcase asset that was transferred.

Plaintiff also notes that Defendants transferred 51% of their solely owned company, M&M, to Stephanie Priel[74] in December, 2003, just 6 months before their bankruptcy filing.  Exhibit 15 is an agreement between M&M and Priel dated December 31, 2003.  It evidences the transfer of 127 escrow accounts (generating $750.00 in fees per month) and 51% of the stock in M&M to Priel (dba "A Better Choice (ABC) Escrow and Property Management") for $9,000.00, plus Priel's assumption of a $1,000.00 obligation to upgrade software to handle the escrows and reflect the change in the name of the servicing entity, plus her commitment of the labor in cleaning and transferring the files, plus her assumption of responsibility for "tax processing for 2003 files for M&M Escrow."  *See id.* at 1.  Priel also agreed to operate her business in the building at 12551 Government Way for at least a year, and during that year continue her work as an office assistant for M&M.  *Id.*[75]

---

[74]  Mrs. Noordam testified that Priel started working for M&M in 2002 as "secretarial help" and was also a "clerk" in 2003.  Priel also notarized the majority of the documents introduced into evidence, though Cord notarized some, such as Ex. 15.

[75]  Priel is not just an employee of Defendants and their businesses.  She is also the daughter of Steve and Sharon Bingham, who were secured creditors on the property at 12551 Government Way and "repossessed" it in October, 2003.  *See* Ex. 3 at SOFA, response to question 4(b), and discussion, *supra*, at note 64.

MEMORANDUM OF DECISION - 56

In addition to questioning the bona fides of the transaction, Plaintiff raised a § 727(a)(5) issue, questioning whether Defendants could account for the funds they received under this agreement.[76]  *See* Ex. 15 at 5 (showing receipt for $2,000.00 cash from Priel on December 20, 2003 under agreement); and Ex. 34 at 1 (showing deposit of $2,000.00 cash to Defendants' personal account on December 20, 2003, denoted on the deposit as from "Steph"); *see also* Ex. 15 at 4 (showing receipt of $7,000.00 cash from Priel on December 31, 2003).

In response, Mrs. Noordam said she expended the $2,000.00 payment by Christmas but certainly by the time of the $7,000.00 payment on December 31. *Accord* Ex. 6 at 42-44.  She also said she spent the $7,000.00 – which she kept in her billfold in cash – over the next three months. *Id.* at 44-45.[77]

Part of the cash, around $1,100.00, allegedly went to American General to cure a mortgage delinquency. *Id.* at 45-46.  Defendants produced no proof that the American General payment was made or that this mortgagee accepted cash.  They did provide in discovery a number of cash register receipts to support their explanation for the disposition of the remaining funds. *See* Ex. 35.  The receipts,

---

[76] Unlike the situation with several of Defendants' prebankruptcy acts, Plaintiff did not argue here that the transfer was undisclosed in the bankruptcy.  It was disclosed. *See* Ex. 3 at SOFA, response to question 10.

[77] In her testimony at the § 341(a) meeting, Mrs. Noordam said payment was made by Priel by a check, which Defendants cashed.  Ex. 4 at 17.  But at her deposition, Mrs. Noordam said that there was no check and Priel paid in cash because that was what Mrs. Noordam preferred and the way she had requested it be paid.  Ex. 6 at 43-44.  In both examinations, she testified that the funds were kept as cash and never deposited.  Ex. 4 at 17; Ex. 6 at 44.

MEMORANDUM OF DECISION - 57

however, fall short of accounting for the full amount, and several are for times

outside the asserted three month period.  In short, Defendants failed to

satisfactorily explain the disposition of these funds.[78]

The payments from Priel are not the only funds unaccounted for.  The

evidence indicates substantial funds were drawn out of the M&M accounts by

checks made payable to "cash" or to Mrs. Noordam or to Defendants together

exceeding $32,000.00 between December, 2002 and November, 2003.  *See* Ex. 9

(checks from M&M Realty Services account or M&M Operations Trust

Account).[79]  These checks were endorsed "for deposit only" into Defendants'

personal account.  *Id.*; *see also* discussion at note 61, *supra*.  These funds were

obtained by Defendants in a period during which they claimed that Mr. Noordam

earned no gross income and Mrs. Noordam earned or "drew" only $18,000.00 in

---

[78]  Many of the receipts are hard to read.  Some are undated.  Some are as small as $2.86 at a grocery and $1.68 at Costco.  Some precede the December 20 date when the first $2,000.00 was received (which payment, as noted, apparently went into Defendants' personal checking account anyway.  *See* Ex. 34 at 1).  Some receipts are dated in April and May, 2004, which is after the three month period from December 31, 2003 during which Mrs. Noordam claimed the funds were expended.  The total of these receipts provided by Defendants is approximately $1,560.00.  Even if $1,100.00 of the $7,000.00 was paid to American General as claimed, there would still be $5,900.00 to account for.  The $1,560.00 in receipts falls short.  The Court did note seven separate deposit slips to Defendants' personal account from January 9 to March 12, 2004 reflecting $5,000.00 in currency deposits.  *See* Ex. 34 at 2-8.  While this *might* address some of the disposition, Mrs. Noordam's testimony was that none of the $7,000.00 paid by Priel was ever deposited.  *See* note 77.  Recall, too, that there were other "cash" withdrawals made throughout 2003, as reflected in Exs. 10 and 26, and it would be impossible to conclude that the deposits into the personal account were the Priel funds.

[79]  These include a Sept. 26, 2003 check from M&M to Defendants for $5,000.00 noted as "loan for legal fees, 01-MAR".  *See* Ex. 9 at 22.  This "loan" was not shown on Defendants' schedules, and the receivable was not shown on MAR's balance sheet.  *See* Ex. 3.

MEMORANDUM OF DECISION - 58

gross income.  *See*, *e.g.*, Ex. 3 at SOFA, response to question 1.  No adequate

showing of the disposition of the excess funds was made.[80]

The Court concludes that Plaintiff established his cause of action under

§ 727(a)(5), and Defendants' discharge will be denied.

### G.   Cause of action under § 727(a)(7)

#### 1.   Standards

Section 727(a)(7) bars a discharge if a debtor "has committed any act

specified in paragraph (2), (3), (4), (5), or (6) of this subsection [§ 727(a)], on or

within one year before the date of the filing of the petition, or during the case, in

connection with another case under this title . . . concerning an insider."  This

Court has noted that "insider" is a term of bankruptcy art and is, at least initially,

defined in § 101(31).  *Couch-Russell*, 03.4 I.B.C.R. at 232.  For debtors who are

individuals, like Defendants, insiders include: (i) a relative of one or both

Defendants or of a general partner of Defendants; (ii) a partnership in which one

or both Defendants is a general partner; (iii) a general partner of one or both

Defendants; and (iv) a corporation of which one or both Defendants is a director,

officer, or person in control.  *See* § 101(31)(A)(i) - (iv).

---

[80]  Plaintiff also argues that the disposition of the $30,000.00 of funds advanced by the
Jacksons was not adequately explained.  It was "explained" in Mrs. Noordam's testimony (*i.e.*, a
payment on an existing deed of trust, payment of outstanding property taxes, payments for home
repairs), but the explanation was not corroborated.

MEMORANDUM OF DECISION - 59

The prohibition "extends the basis for denial of discharge to the debtor's misconduct in a substantially contemporaneous related bankruptcy case." *Id.* at 232 n.7 (citing 6 Collier on Bankruptcy ¶727.10, at 727-52 to 727-54). An action under this section "requires proof that the debtor: (a) within a year preceding or during the pendency of his own case, (b) committed any of the objectionable acts that §§ 727(a)(2) - (a)(6) proscribe, (c) in connection with another case concerning an insider." *Id.*

### 2.  Facts and application of standards

Plaintiff argues that the errors and omissions in Cord's bankruptcy filing present a basis for a § 727(a)(7) claim against Defendants. He is in error.

First, while Plaintiff may have shown a close relation between Cord and Defendants, he did not prove that Cord was an "insider" within the reach of this section. Under the evidence, M&M, Miracles and MAR are clearly insiders of Defendants. *See* § 101(31)(A)(iv). This is because as to each, Mrs. Noordam was a director, officer or a person in control. She was also an officer of SPI.[81] But the evidence does not show that Cord was a statutorily defined insider of Defendants.

Second, even if Cord were to be found to be an insider, his errors and omissions are immaterial in a § 727(a)(7) action against Defendants. Section

---

[81] Two of the March 1, 2004 corporate documents Mrs. Noordam prepared for SPI indicate that Cord and O'Masters were or were elected to be directors. A third (minutes of 3/1/04 annual meeting of stockholders) indicates in its text that Mrs. Noordam was a director. *See* Ex. 17. She was clearly a director in 2003. *Id.*

MEMORANDUM OF DECISION - 60

727(a)(7) requires that the "debtor" (*i.e.*, Defendants, or one of them) committed an act falling within § 727(a)(2) through (a)(6), during the one year period before June 2, 2004 or afterward, "in connection with" the insider's bankruptcy case. While Plaintiff has identified arguable failures and errors of Cord in connection with Cord's case, he did not specifically identify conduct of either Defendant "in connection with" Cord's case that falls within the statute.[82]

The cause of action under § 727(a)(7) will be dismissed.

### H.  Surcharge of exempt assets

Plaintiff raised a claim for surcharging Defendants' exempt assets under the authority of *Latman v. Burdette*, 366 F.3d 774 (9th Cir. 2004).  However, Plaintiff provided no analysis or argument regarding this contention.  The Court is not required to develop the necessary arguments for a litigant, and thereafter proceed to evaluate and resolve them.  In light of the manner in which it was presented (or, rather, was not presented), the Court declines to award relief on this cause.

**CONCLUSION**

Defendants' financial dealings were not just inherently complex; they were convoluted and in many ways concealed.  Defendants' questionable actions reach

---

[82]  It might be argued that Mrs. Noordam's sale of Miracles' business operations to Krous in June 2004, after her bankruptcy and Cord's, was an act prohibited by § 727(a)(2)(B) and taken "in connection with" his case as well as her own.  Plaintiff did not fully analyze or argue this, however.  And, as noted, there is also the question of whether Cord could be considered an insider.

MEMORANDUM OF DECISION - 61

back to the time when they restructured their businesses in order to prevent Plaintiff, but not other creditors, from collecting a debt.

However, even if the question of motivation were set aside, Plaintiff established that Defendants did not maintain records and documents adequate in nature, degree or extent to allow creditors, the trustee or the Court to ascertain their financial condition or track their financial dealings with substantial completeness and accuracy for a reasonable period.  Discharge therefore will be denied under § 727(a)(3).

For the failure of Defendants to explain the deficiency of assets to meet their liabilities, their discharge will be denied under § 727(a)(5).  This failure is directly related, factually and legally, to the lack of adequate financial records and documents,

By reason of the several errors and omissions in the bankruptcy schedules and statements, which the Court finds from all the evidence to reflect knowledge and fraudulent intent and a reckless disregard for accuracy and candor, discharge will be denied both Defendants under § 727(a)(4)(A).

Further, for her conduct in connection with the sale of the business of Miracles and the treatment of the rents on the Sunburst Property, the discharge of Mrs. Noordam will also be denied under § 727(a)(2)(B).

MEMORANDUM OF DECISION - 62

All other causes advanced by Plaintiff under § 727(a) will be dismissed, as will the causes of action not sounding under § 727(a).

Counsel for Plaintiff shall prepare a form of judgment consistent with this Decision.  Costs, as provided by and limited under Fed. R. Bankr. P. 7054 and Local Bankruptcy Rule 7054.1, will be awarded Plaintiff.  No attorney's fees will be awarded.

DATED:   August 17, 2005

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 63